**STUDENT ASSOCIATION OF the STATE UNIVERSITY OF NEW YORK, INC., Glen Bock, Individually and as President of the Student Polity of the State University of New York at Stony Brook, an Unincorporated Association, Plaintiffs,**

v.

**Dr. John TOLL, as President and Chief Administrative Officer, State University of New York at Stoney Brook, et al., Defendants.**

**No. 71 C 124.**

United States District Court,
E. D. New York.

Sept. 28, 1971.

---

**456**

Richard A. Lippe, Mineola, N. Y., (Lippe Ruskin, Kaplan & Schlissel, Mineola, N. Y., of counsel), for plaintiffs.

Daniel M. Cohen, New York City (Louis J. Lefkowitz, Atty. Gen., of counsel), for defendants.

## MEMORANDUM and ORDER

DOOLING, District Judge.

Plaintiff seeks a declaratory judgment invalidating Part 535 of Title 8 of the Rules and Regulations of the State of New York. Part 535, adopted under Education Law, McKinney's Consol. Laws, c. 16, § 6450, which authorizes the Trustees of the State University to adopt Rules and Regulations for the maintenance of public order on State College Campuses and to provide a program for the enforcement of them, was promulgated in October 1969.

The Rules commence (Sec. 535.1) with a statement that they are subject to amendment and revision, that nothing in them is intended or is to be construed to limit or restrict the freedom of speech or peaceful assembly. The Section declares that, "free inquiry and free expression are indispensable to the objectives of a higher educational institution. Similarly, experience has demonstrated that the traditional autonomy of the educational institution (and the accompanying institutional responsibility for the maintenance of order) is best suited to achieve these objectives." The Rules are not to be construed "to prevent or limit communication between and among faculty, students and administration, or to relieve the institution of its special responsibility for self regulation in the preservation of public order." The opening section concludes its statement of the purposes of the Rules with the declaration that their purpose

" * * * is not to prevent or restrain controversy and dissent but to prevent abuse of the rights of others and to maintain that public order appropriate to a college or university campus without which there can be no intellectual freedom and they shall be interpreted and applied to that end."

The Rules, which may be supplemented by individual institutions within the State University, are to "govern the conduct of students, faculty and other staff, licensees, invitees, and all other persons, whether or not their presence is authorized, upon the campus of any institution to which such rules are applicable and also upon * * * any other premises * * * under the control of such institution, used in its teaching, research, administrative, service, cultural, recreational, athletic and other programs and activities, provided, however, that charges against any student for violation of these rules upon the premises of any such institution other than the one at which he is in attendance shall be heard and determined at the institution in which he is enrolled as a student."

Section 535.3 of the Rules defines the forbidden conduct narrowly and specifically, and it is not suggested that the rules are in any way subject to criticism in regard to the conduct which they affect. Section 535.4 expressly provides that no student, faculty or staff member or authorized visitor shall be subject to any limitation or penalty solely for the expression of his views nor for having assembled with others for such purpose. Peaceful picketing and other orderly demonstrations in public areas, grounds and buildings will not be interfered with, but those involved in picketing and demonstrations may not violate the specific rules defining forbidden conduct. Each component institution of the University is promptly to promulgate a procedure for giving reasonable advance notice of any planned assembly, picketing or demonstration upon the grounds of the institution but "the giving of such notice shall not be made a condition precedent to any such assembly, picketing or demonstration." Thus there may be no prior restraint upon freedom of speech and assembly.

Plainly the Rules are a clear-cut bill of rights and not a code of repression. Under Section 535.7 even in cases of apparent violation of the Rules—unless an immediate threat of injury to person or property is posed—administration is to make every reasonable effort to learn the cause of the conduct in question and to persuade those engaged in it to desist and to have recourse to permissible methods for the resolution of any issues presented, and administration must warn the persons involved of the consequences of persistence in prohibited conduct including their ejection from the institution's premises where their continued presence is a violation of the Rules. Only if the violation of the Rules continues after warning is administration to eject the violator and initiate disciplinary proceedings.

Under Section 535.8 full and prompt communication among all components of the institutional community, faculty, students and administration, is declared to be highly desirable and, to the extent that time and circumstances permit, such communication is to precede the exercise of the authority and discretion and responsibility granted and imposed by the Rules. The institution is to employ such means, formal and informal, as will promote communication.

Plaintiffs criticize the Rules as in three respects denying due process. *First*, it is claimed the Rules vest investigatory, prosecutory and judicial functions in the Chief Administrative Officer of each campus (Sec. 535.9(b), (i)); *Second*, it claimed that the Chief Administrative Officer is empowered to suspend a person charged without any hearing pending the hearing and determination of the charge (Sec. 535.9(f)); and *Third*, Section 535.9(d) establishes a legal presumption that the charges are true when the student fails to appear before the Hearing Committee after due notice.

The criticisms thus made appear to misread the Rules. Exactly how the Rules have been or will be implemented and used does not appear, for the present case presents the issue in a completely abstract form as an argument, essentially, that the Rules can be interpreted to authorize kinds of action which, plain-

tiffs contend, would deny due process. But the Rules themselves do not require and do not appear to contemplate that they should be so employed. Indeed, simply because the case is presented in the abstract, there is very much to be said for the defendants' insistence that this is not a case of actual controversy but one in which a purely advisory opinion is sought. The brief analysis necessary to show that the claims now made are without substance can, however, serve as well to explain why the case is without substance, since the Rules are not such as to stifle the freedoms of speech and peaceful assembly which they are designed to safeguard from disorder or to deny appropriate due process in their enforcement procedures.

1. The role of the Chief Administrative Officer is plainly one of ultimate responsibility. It is the Chief Administrative Officer himself (or anyone discharging the duties of his office during a vacancy or an absence or a disability) who alone can authorize the initiation of a charge proceeding and impose the ultimate sanction or acquittal (Sec. 535.-9(b), (i)). He initiates the proceeding upon a complaint made to him or on his own motion where he has personal knowledge. However, under Sec. 535.9 (b) he is then to "cause an investigation to be made." He is not directly to conduct the investigation or to be the investigating officer. Before the matter can go forward beyond the investigation stage, the investigatory statements must be submitted to him and no charges may be prepared unless he is satisfied that there is reasonable ground to believe that there has been a violation. He must then either prepare or cause to be prepared charges which state the provision allegedly violated and specify the ultimate facts alleged to constitute the offense.

These provisions of Section 535.9(b) cannot be read as making the Chief Administrative Officer accuser, investigator and prosecutor. Rather, Section 535.9(b) assigns to the Chief Administrative Officer the restraining, the screening, the testing role of one who is to see that charges are not idly and emptily made. The sub-section, in a word, is a safeguard against hasty and ill-advised action on complaints and on statements taken during investigations. The sub-section could scarcely bear the interpretation that the Chief Administrative Officer would himself become the investigating officer and collect the statements of the complaining witnesses and others having knowledge of the facts and so acquire a disqualifying bias through possession of information gathered *ex parte*. The contrary appears to be the overwhelming import of the language of the section, and in the absence of a different use of it in practice, plaintiffs' interpretation of it must be wholly rejected.

With the trial itself—to use that term to summarize the fact-finding procedures—the Chief Administrative Officer is not involved. The hearing is conducted by a Hearing Committee of unimpeachable constituency. The student has the right of appearance and may have representatives of his own choice; he may confront and examine witnesses and produce witnesses and documentary evidence. Only the student may request a closed hearing, and a transcript of proceedings must be made. The Hearing Committee must make and submit a report of its findings of facts and recommendations for the disposition of the charges.

However, final authority to dismiss the charges or determine the guilt of those against whom they are made and to impose sanctions, up to and including expulsion, is exclusively the responsibility of the Chief Administrative Officer. He may review the findings of facts, but any new findings that he makes must be based on substantial evidence in the record, and he must incorporate them in the notice of his final determination served upon the student. Again, the lodging of authority and responsibility in the Chief Administrative Officer is a safeguard, and an assurance of review at the highest administrative

level before action can be taken. The Chief Administrative Officer may, indeed, reject a recommendation of non-action and impose a sanction, but that is patently a very common provision governing many forms of ultimate administrative action where adjudicatory hearings are conducted by hearing examiners.

No doubt a case could arise in which a Chief Administrative Officer had so involved himself in earlier stages of proceedings that it would be improper and inadvisable for him to act at the final stage of the case, but in such a situation the shortcoming would be one of actual administration and not a defect in the rules.

■ The claim that the Rules are incompatible with due process because of a union of inconsistent roles in the Chief Administrative Officer of the institution is without merit and must be rejected.

■ 2. The Chief Administrative Officer—and only he—may, upon the service of the charge, suspend the named student pending the hearing and determination of the charge "whenever, in his judgment, the continued presence of such student would constitute a clear danger to himself or to the safety of persons or property on the premises of the institution or would pose an immediate threat of disruptive interference with the normal conduct of the institution's activities and functions." The power of suspension is not the rule of procedure but the exception from ordinary procedure, and it is to be invoked only when the Chief Administrative Officer himself finds the exigent circumstances required by the rule. Nor is that all of the rule. It continues: "the Chief Administrative Officer shall grant an immediate hearing on request of any student so suspended with respect to the basis for such suspension."

The analogy to the *ex parte* restraining order which must be the subject of an immediate hearing before a temporary injunction *pendente lite* can be made, or the restraining order continued in effect, is immediately apparent. No denial of due process is implicit in the structure of the Rule. See Powe v. Miles, 2d Cir. 1968, 407 F.2d 73, 84–85; Coleman v. Wagner College, 2d Cir. 1970, 429 F.2d 1120, 1127.

There could of course be instances in which the power was exercised ill-advisably, but the rule itself displays no invalidity in form, in purpose, or in the definition of the situations in which the power of suspension can be invoked. Certainly on the present record it must be assumed that the rule will be used only in the circumstances which it describes, upon adequate evidence, and with a genuine opportunity for a real and immediate hearing in the doubtful case.

The inclusion of the power in the rules is surely a wise expedient, for particular cases could be so charged with risks of violence that exclusion of the student from school temporarily would be dictated by considerations of his own personal welfare and safety.

■ 3. The provision for, in effect, a default judgment in Section 535.9(d) is not a denial of due process. It creates no presumption. On the contrary, it has the conventional effect of proceeding on the basis that unanswered charges are admitted charges, a norm of human analysis of human facts that is all but universal. Moreover, the matter is not then at an end; the hearing committee must still formulate proposed findings and recommendations and they must be submitted for review to the Chief Administrative Officer. Meanwhile if the student shows good cause for his failure to appear, a date for hearing must be fixed. The rule manifestly safeguards every proper interest of the student, and is safe from the impeachment that it denies due process.

It must be concluded that the three challenges to the rules are unsubstantial and fanciful. The rules are well and thoughtfully drafted, with a circumspect regard for due process that is exemplary.

Plaintiffs formally withdrew the application for an injunction, and it is

considered that the withdrawal, under the literal language of 28 U.S.C. § 2281 disposes of the necessity for a three judge court. See United States v. Nevada Tax Commission, 9th Cir. 1971, 439 F.2d 435, 438; Alameda Conservation Association v. State of California, 9th Cir. 1971, 437 F.2d 1087, 1093; Bradley v. School Board, E.D.Va.1971, 324 F. Supp. 396, 398; Wright, Federal Courts, 2d Ed. 1970, 190; *cf.* Kennedy v. Mendoza-Martinez, 1963, 372 U.S. 144, 154, 83 S.Ct. 554, 9 L.Ed.2d 644; Flemming v. Nestor, 1960, 363 U.S. 603, 606–607, 80 S.Ct. 1367, 4 L.Ed.2d 1435. Note: Calloway v. Briggs, 6th Cir. 1971, 443 F.2d 296.

Since the complaint presents no substantial federal questions, defendants' motion for judgment must be granted and plaintiffs' cross-motion denied.