**TENNECO OIL COMPANY, Plaintiff,**

v.

**DEPARTMENT OF ENERGY and James R. Schlesinger, Secretary, Department of Energy, Defendants.**

**Civ. A. No. 77–486.**

United States District Court,
D. Delaware.

July 6, 1979.

---

**2.** This, of course, only highlights the evidence submitted by the government in support of its claim.

William O. LaMotte, III, Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for plaintiff; John P. Mathis and Thomas J. Eastment, Baker & Botts, Washington, D.C., of counsel.

James W. Garvin, Jr., U.S. Atty., John H. McDonald, Asst. U.S. Atty., Dept. of Justice, Wilmington, Del., Barbara Babcock, Asst. Atty. Gen., David A. Engels, Arthur Gowran, George Kielman and Neal Tonken, Dept. of Energy, Washington, D.C., for defendants.

## OPINION

MURRAY M. SCHWARTZ, District Judge.

Tenneco Oil Company ("Tenneco") seeks judicial review of various orders issued by the Department of Energy ("DOE") and its predecessor agencies, the Federal Energy Administration ("FEA") and the Cost-of-Living Council ("CLC"). DOE determined that Tenneco had failed to comply with regulations of the FEA and the CLC governing the calculation of price for certain products subject to petroleum industry price control, as authorized by the Emergency Petroleum Allocation Act of 1973, 15 U.S.C. § 751, *et seq.* and the Federal Energy Administration Act of 1974, 15 U.S.C. § 761, *et seq.* Having concluded that Tenneco was not in compliance with the terms of the pricing regulations, the Department also denied Tenneco's application for exception relief, in which the Company argued that it should be exempted from the regulations as interpreted by the DOE in the enforcement proceedings, because their literal application to Tenneco produced an inequitable result contrary to the intent of the regulations and their enabling statutes.

Tenneco's complaint in this action challenges the decisions reached in the enforcement and exception proceedings and raises eight separate grounds upon which Tenneco urges this Court to overturn the results of the proceedings below. Presently before the Court is DOE's motion to dismiss Counts II, V, VII and VIII of the complaint, on the theory that the arguments raised therein were never presented in the administrative agency's proceedings and therefore must be deemed waived.[1] Because defendants' motion references portions of the administrative record of the proceedings below, and therefore requires the Court to consider matters outside the pleadings, the motion will be treated as a motion for partial summary judgment, as contemplated by F.R.Civ.P. 12(b). *See Moreland v. Western Pennsylvania Interscholastic Athletic League,* 572 F.2d 121 (3d Cir. 1978); 5 C. Wright & A. Miller, *Federal*

---

1. DOE's motion, as originally filed, sought dismissal of the entire complaint, or alternatively a stay of the review proceedings, on the grounds that administrative appeals were still pending before the agency. DOE's denial of these appeals prior to argument on the present motions has removed this "forum exhaustion" question from the Court's consideration and has left only the question of "issue exhaustion" as applied to Counts II, V, VII and VIII.

*Practice & Procedure* § 1366 (1969). Also presented for resolution by the the Court is the parties' dispute concerning the proper scope of discovery in this action. Tenneco has served interrogatories upon DOE and filed a motion to compel answers, and DOE has filed a motion for a protective order; the parties have mutually agreed to stay all discovery pending this Court's disposition of the defendants' motion to dismiss. Before addressing the questions presented by the pending motions, it is appropriate to provide a brief overview of the statutory scheme and the administrative proceedings that have given rise to this lawsuit.

## I. BACKGROUND

The CLC "Phase IV" Price Regulations, as incorporated by the Mandatory Petroleum Price Regulations of the FEA, established a comprehensive system for regulating the price of products produced in the petroleum industry.[2] The pricing mechanism applicable to refiners such as Tenneco permitted a refiner to "increase its May 15, 1973 selling price to each class of purchaser each calendar month beginning with February, 1976 by an amount to reflect the increased product costs plus the increased non-product costs attributable to sales of that covered product using the differential between the month of measurement and the month of May 1973 . . . ." 10 C.F.R. § 212.83(c)(1)(i)(A). Increased product and non-product costs were to be calculated in accordance with formulae set forth in the regulations and were defined in such a manner as to permit the refiner to pass on to the purchaser its increased costs of petroleum or petroleum products, as well as in-

creased costs for transportation, import fees, etc. *See* 10 C.F.R. § 212.82.

Tenneco contends that the use of May 1973 as the base period of reference in establishing the pricing regulations "produced a bizarre result, because the month of May 1973 was not representative of Tenneco's normal gasoline resale operations." [3] The Company asserts that in April and May of 1973 it had purchased and accumulated a large quantity of gasoline priced considerably higher than that which it had been accustomed to purchasing. This gasoline was to be sold in connection with a new sales program that was to begin on June 1, 1973, and therefore the prices in effect in May, 1973 did not reflect the increased costs Tenneco had incurred in acquiring the more expensive gasoline. Tenneco contends that, under DOE's interpretation of its regulations, the Company was required to take into account the more expensive reserves it had purchased and to calculate the cost of purchased gasoline during the base period at a level higher than the Company's posted wholesale selling price on May 15, 1973. Tenneco argues that under a regulatory system aimed at maintaining a constant cents-per-gallon profit, it has effectively been locked into a loss on every gallon of gasoline it sold. Immediately recognizing a potential problem when May, 1973 was designated the base period for the pricing regulations, Tenneco pursued two basic avenues of relief. First, allegedly relying upon advice and assurances given by CLC officials, Tenneco excluded part of the more expensive reserved oil from its calculations of the May 1973 base cost. This approach permitted Tenneco to show a lower base

---

**2.** The "Phase IV" regulations were promulgated by the CLC pursuant to the executive authority granted by the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 and delegated to the CLC in Executive Order No. 11615, 36 Fed. Reg. 15727 (Aug. 17, 1971). The substance of these regulations was incorporated into the mandatory petroleum price regulations promulgated by the Federal Energy Office (the successor to the CLC) under the Emergency Petroleum Allocation Act of 1973, 15 U.S.C. § 751, *et seq.*, and Executive Order No. 11748, 38 Fed. Reg. 33575 (Dec. 6, 1973). The price controls were subsequently administered by the FEA

after its creation by the Federal Energy Administration Act of 1974, 15 U.S.C. § 761, *et seq.*, and they are presently enforced by the DOE pursuant to the Department of Energy Organization Act (Pub.L. 95–91) and Executive Order No. 12009, 42 Fed.Reg. 46267 (Sept. 15, 1977).

The refiner price rule here at issue underwent relatively few changes during its travels among the jurisdictions of the fourth successive regulatory agencies, and it is set forth at 10 C.F.R. 212.83(c)(1).

**3.** Doc. No. 28, at 5.

cost, to treat part of the higher cost of the remaining high-priced gasoline as increased cost of petroleum products in subsequent months and to reflect that higher cost in its pricing. Second, Tenneco applied to the FEA's Office of Exceptions and Appeals, seeking relief from application of the Phase IV regulations on the grounds that they produced a special inequity or hardship in Tenneco's case. Tenneco's two-pronged approach to its problem ultimately resulted in two tracks of DOE and FEA proceedings, the outcomes of which Tenneco now challenges.

The agencies' enforcement proceedings against Tenneco began with the issuance of a Notice of Probable Violation on November 25, 1975, in which the FEA asserted that Tenneco had overcharged its customers in the amount of $12,216,000 because it had underestimated its base costs as of May 1973. A Remedial Order was issued on February 2, 1977, directing Tenneco to refund the overcharges to its customers. Tenneco appealed the Remedial Order, advancing essentially two alternative grounds. First, Tenneco argued that it had calculated its base costs in reliance on the advice received from CLC officials, and that therefore FEA was estopped from challenging the Company's costs calculations. Second, Tenneco asserted that the regulations permitted it to reallocate its increased costs for petroleum products other than gasoline, as well as increased non-product costs, in order to raise its calculations of gasoline cost increases, and that the Company would have engaged in such reallocation had it known that the original base cost calculations would be unacceptable to FEA.[4] Tenneco's appeal was denied on June 17, 1977 on the grounds, *inter alia*, that the Company had failed to demonstrate that it in fact had accumulated banks of unrecouped cost increases (either product or non-product) that it could reallocate. Tenneco then filed a

Request for Modification in which it sought to demonstrate that it indeed had product and non-product cost increases available for reallocation. On November 15, 1977 a Decision and Order issued holding that the regulations permitted no retroactive reallocation of product cost increases, and remanding to the regional office the question whether Tenneco should be permitted retroactively to reallocate non-product costs. Pursuant to the remand a Revised Remedial Order was issued on February 15, 1978, permitting Tenneco to reallocate its non-product costs and thereby to reduce the total amount of overcharges by $328,000. Tenneco took an appeal from the Revised Remedial Order, in which it challenged the decision prohibiting its reallocation of costs increases attributable to "other covered products" to permit a showing of higher gasoline cost increases. This appeal also raised a question whether non-product costs (reallocable under the Revised Remedial Order) could be applied according to the "reverse sequential" method of cost recovery.[5] On August 14, 1978 DOE issued a Decision and Order denying Tenneco's appeal from the Revised Remedial Order and holding that retroactive reallocation of product costs from other covered products to gasoline was impermissible. DOE also refused to consider the propriety of using the reverse sequential method of reallocation of non-product costs, noting that Tenneco had previously failed to raise the argument that it was entitled to use this method.

Contemporaneously, FEA and DOE were considering Tenneco's Request for Exception Relief, filed March 10, 1976 and supplemented May 12, 1976. The exception request was denied on October 1, 1976, and the appeal therefrom was also denied on March 31, 1977. Thereafter Tenneco filed a Request for Reconsideration and Modification, which was denied on November 2,

---

4. Tenneco's "retroactive reallocation" claim was based on its interpretation of the "overrecoupment of increased costs" provisions of the FEA and DOE regulations. 10 C.F.R. § 212.-83(g).

5. Although the propriety of this method of cost recovery is urged by Tenneco for consideration by this Court, the question is not addressed in the Company's complaint or amended complaint, and is therefore not properly posed for decision.

1978. As will be discussed presently, the parties disagree on precisely what issues were raised in the exception proceedings, but it is apparent that the gravamen of Tenneco's claim for exception relief was that application of the price regulations, as interpreted by FEA and DOE, to Tenneco's peculiar situation created a result that was both unintended by Congress and unduly harsh.

Tenneco presently attacks DOE's final decisions in the enforcement and exception proceedings on the grounds that these decisions reflect a change in the agency's interpretation of its regulations that was not made in accordance with statutory procedural requirements;[6] that the decision reached in the exception proceedings was based on the application of the wrong statutory standard, but that even under the statutory standard applied, Tenneco is entitled to exception relief;[7] that DOE is estopped from challenging Tenneco's interpretations of the regulations and from denying Tenneco the right retroactively to reallocate banked non-gas costs;[8] that DOE's refusal to permit retroactive reallocation is arbitrary, capricious, beyond DOE's authority and contrary to the regulations' intent;[9] and that DOE's orders deprived Tenneco of property without due process of law.[10] In its prayer for relief, Tenneco first seeks a declaratory judgment voiding DOE's Decisions and Orders denying Tenneco exception relief and requiring enforcement of the regulations as interpreted by the agency. Second, Tenneco seeks a declaratory judgment voiding DOE's refusal to permit it to reallocate retroactively its banked non-gas costs. Third, Tenneco asks the Court to enjoin permanently DOE's enforcement actions against Tenneco based on the matters here involved. Fourth, Tenneco asks this

Court to certify any constitutional issue reached to the Temporary Emergency Court of Appeals. Finally, Tenneco seeks all other just and equitable relief.

## II. DOE'S MOTION TO DISMISS

In its motion to dismiss, DOE contends that the arguments Tenneco raises in Counts II, V, VII and VIII of the amended complaint were never before presented to DOE in the administrative proceedings, and therefore must be deemed waived.[11] The principle upon which DOE relies is well-established. In 1946 the Supreme Court's opinion in *Unemployment Compensation Commission v. Aragon*, 329 U.S. 143, 67 S.Ct. 245, 91 L.Ed. 136 (1946), stated:

A reviewing court usurps the agency's function when it sets aside the administrative determination upon a ground not theretofore presented and deprives the [administrative agency] of an opportunity to consider the matter, make its ruling, and state the reasons for its action.[12]

The rule that issues or arguments not raised to an administrative agency cannot be considered by a reviewing court furthers the goal of permitting agencies to apply their specialized expertise and to correct their own errors, *U. S. v. Tucker Truck Lines*, 344 U.S. 33, 37, 73 S.Ct. 67, 97 L.Ed. 54 (1952), and also discourages litigants before an agency from reserving an issue for appeal that may broaden the scope of the reviewing court's factual inquiry or induce a remand "if all else fails," *Washington Utilities v. FCC*, 513 F.2d 1142, 1169 (9th Cir. 1975).

Tenneco contends that the rule articulated in *Aragon* and *Tucker Truck Lines* is not an absolute one and that it is inapplicable to the claims raised in Counts II, V and VIII. As to Count VII, Tenneco seeks to demon-

---

**6.** Amended Complaint, Doc. No. 10, Counts I and VIII.

**7.** *Id.* Counts II and III.

**8.** *Id.* Counts IV and VII.

**9.** *Id.* Count VI.

**10.** *Id.* Count V.

**11.** At oral argument, DOE's attorney confirmed that the agency does not raise its waiver argument with respect to Counts I, III, IV and VI of the Amended Complaint, and therefore concedes that the issues raised in those Counts are ripe for judicial review. Transcript of Argument, Nov. 3, 1978, p. 14.

**12.** 329 U.S. at 155, 67 S.Ct. at 251.

**308**

strate that the issues therein raised were in fact presented to DOE or to FEA at some point in the extensive administrative proceedings before those agencies. The Court will now consider the validity of these arguments as they apply to each of the four challenged Counts.

### A. COUNT II: PROPRIETY OF THE STANDARD FOR EXCEPTION RELIEF .

 Count II of Tenneco's amended complaint asserts that the FEA "acted beyond its authority by applying the wrong standard for exception relief to Tenneco's Application for Exception . . . ."[13] Specifically, Tenneco asserts that

> [t]he statutory standard for such relief is bottomed on a showing of "special hardship, inequity, or unfair distribution of burdens." 15 U.S.C. § 766(i)(1)(D). The FEA erred in applying a standard of "gross inequity"—a standard that was set forth in the Economic Stabilization Act of 1970, continued under the Emergency Petroleum Allocation Act, but explicitly changed by Congress in the Federal Energy Administration Act.[14]

DOE challenges Tenneco's right to raise this claim to the reviewing court on the grounds that all of Tenneco's submission to the agencies in connection with the exception proceedings referenced the "gross inequity" standard and argued that Tenneco's case fell within that standard, rather than claiming that the Company's position should be evaluated in light of a lower statutory standard. Although Tenneco's initial memorandum addressing the waiver issues seeks to demonstrate that the claim embodied in Count II was indeed raised in the administrative proceedings below,[15] the plaintiff's post-argument briefs seem to retreat from this position and to argue rather that no waiver should be inferred from the Company's failure to raise its claim below. Indeed, Tenneco can point to no submission in the exception proceedings in which it noted the changed statutory standard or contended for a standard other than "gross inequity." It is concluded that Tenneco's position in the exception proceedings was that which is presently embodied in Count III of its amended complaint and which claims that even under the higher standard, Tenneco is entitled to exception relief. The question thus remaining for decision is whether Tenneco's failure to seek application of the "special hardship, inequity, or unfair distribution of burdens" standard in the administrative proceedings must be viewed as a waiver of its right to argue before this Court that DOE should have applied that lower statutory standard in deciding whether to grant exception relief.

Preliminarily, Tenneco urges that the lower standard is in fact the applicable one, and the waiver question as to Count II should be avoided on the grounds that the duty of the Court to adjudicate Count III will require this Court, or the administrative agency on remand, to view the plaintiff's claim for exception relief in light of the lower standard. Count III urges that, even under the gross inequity standard, Tenneco is entitled to exception relief. Although this Court agrees that if the lower standard is held to be applicable, consideration of Tenneco's right to exception relief under the gross inequity standard would be a meaningless endeavor, Tenneco's argument misapprehends the nature and consequences of the waiver doctrine. If a waiver must be inferred from Tenneco's failure to raise its statutory standard arguments to the administrative agencies, the essential result of that inference will be to deprive Tenneco of the right to have any but the "gross inequity" standard applied to its claims for exception relief. If the statutory standard question is removed from this Court's consideration under the waiver theory, Tenneco has no right to request that the Court decide it indirectly when considering the claims properly advanced in Count III.

**13.** Doc. No. 10, § 62.

**14.** *Id.*

**15.** Doc. No. 39, pp. 8–12.

Although this Court concludes that its duty to consider the Count III claims does not automatically moot the question whether a waiver of the Count II claims must be inferred, the fact that the Court will necessarily have to adjudicate Count III is of some relevance to deciding whether the usual rule precluding judicial review of issues not presented to the administrative agency should be applied to the claims raised in Count II. As the Supreme Court recognized in *Hormel v. Helvering*, 312 U.S. 552, 61 S.Ct. 719, 85 L.Ed. 1037 (1941), a rule requiring airing of issues at the administrative level is not an absolute or inflexible one. "There may always be exceptional cases or particular circumstances which will prompt a reviewing or appellate court, where injustice might otherwise result to consider questions of law which were neither pressed nor passed upon by the court or administrative agency below." [16] The *Hormel* opinion involved a decision of the Board of Tax Appeals, which operated under a statute providing that the reviewing court should have "power to affirm or, if the decision of the Board is not in accordance with the law, to modify or to reverse the decision of the Board, with or without remanding the case for a rehearing, as justice may require." 26 U.S.C. § 1141(c)(1) (Supp. 1939). Nevertheless, the Court noted that

> the philosophy underlying the exceptions to the general practice [of requiring issues to be presented to the administrative agency] is in accord with the statutory authority given to courts reviewing decisions of the Board of Tax Appeals—decisions not in accordance with law should be modified, reversed or reversed and remanded "as justice may require." [17]

If the decisions of DOE and FEA applied the wrong statutory standard for granting exception relief, it is clear that their orders are not in accordance with law. Moreover, finding waiver of the statutory standard issue in this case would create the anomaly of requiring the reviewing court (or the administrative agency on remand) to apply an arguable erroneous standard in deciding the claims raised in Count III.[18] To infer a waiver that may well result in further proceedings in which an erroneous standard is applied would be even more abhorrent to the values stressed by the *Hormel* decision than would be true if a reviewing court were merely refusing to disturb an administrative agency's decision.

Several additional factors argue that Tenneco's failure to raise the Count II statutory standard argument before the administrative agencies should not be held to constitute a waiver of that claim. The question presented is a purely legal one involving statutory interpretation, and it is not one upon which the specialized expertise of DOE might shed a particularly useful light. *See McKart v. United States*, 395 U.S. 185, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969). DOE notes that in the *McKart* case, the Court focused upon the absence of any risk that its ruling would encourage litigants before an administrative agency to by-pass available administrative remedies by failing to raise claims at the administrative level. Although DOE contends that no reasonable basis (such as the threat of criminal prosecution that existed in *McKart*) can be found to justify Tenneco's failure to raise its statutory standard argument below, this Court has found no evidence that Tenneco was husbanding this argument as an appeal point. Were the Count II issue the only one presented to this reviewing court, it might find no basis for excusing Tenneco's prior silence, but in the context of a panoply of other claims—four of which must concededly be heard by this Court and one of which

---

**16.** 312 U.S. at 557, 61 S.Ct. at 721, citing *Blair v. Oesterlein Machine Co.*, 275 U.S. 220, 225, 48 S.Ct. 87, 72 L.Ed. 249.

**17.** 312 U.S. at 559, 61 S.Ct. at 722.

**18.** DOE, of course, does not concede that an erroneous standard was applied, but argues that because Tenneco's cause of action arose under the Emergency Petroleum Allocation Act of 1973, the savings provision of the Federal Energy Administration Act, 15 U.S.C. § 767(a) and (b), retains the applicability of the higher "gross inequity" standard.

entails examination of Tenneco's claim for exception relief—any threat presented to the integrity of the administrative process is of diminished importance.

The argument that the raising of claims at the administrative level is necessary to permit an administrative agency to correct its own errors and thereby conserve the time of a reviewing court is likewise inapplicable to the particular claims raised in Count II. In exercising its substantial discretion to determine whether the exhaustion doctrine should be applied to demand an inference of waiver, the Court may consider whether the agency involved would have been receptive to the omitted claims, had they been presented to it. Prior to Tenneco's submission of its Request for Exception Relief, DOE's predecessor agency had already held that its application of the "gross inequity" standard was consistent with the lower inequity standard articulated in the FEAA. *Sun Oil Company*, 2 FEAA ¶ 80,674 (August 29, 1975). Under these circumstances, this Court cannot conclude that DOE would have been likely to respond favorably to Tenneco's exception request had it focused on the differing statutory standards, as opposed to stressing the strictness with which the higher standard was applied.

Finally, although in the absence of particular prejudice to Tenneco, the balance might tip in favor of applying the usual rule requiring exhaustion (even in a case such as this where deference to administrative expertise and integrity of administrative processes are not seriously impaired),[19] Tenneco has made substantial allegations of prejudice. Tenneco asserts that DOE's interpretations of its regulations have forced the Company to absorb a net loss on every gallon of gasoline sold under the government's system of price control, and that exception relief should have been granted under the FEAA's lower standard for relief. At this juncture, the Court must view these allegations as true for the purposes of evaluating the prejudice that will flow to Tenneco if a waiver of the statutory standard argument is inferred, and it must be concluded that the interest of justice is not served by such an inference.

In summary, it is held that the usual rationale for inferring a waiver of issues not raised before an administrative agency are inapplicable to the claims embodied in Count II, and that the possible anomaly of requiring the Court or the agency to apply an erroneous statutory standard when considering Count III can best be avoided by permitting judicial consideration of the question whether the higher "gross inequity' standard of the EPAA or the lower one of the FEAA is applicable to Tenneco's Request for Exceptions Relief.[20] DOE's motion to dismiss Count II will be denied.

## B. COUNT V: DEPRIVATION OF PROPERTY WITHOUT DUE PROCESS OF LAW

■ Count V of Tenneco's amended complaint avers that:

The government's refusal to grant exception relief and to countermand the Remedial Order in the circumstances of this case will deprive Tenneco of property without due process of law or just compensation in violation of Amendment Five of the Constitution of the United States. Thus, the government's decisions of March 31, 1977 and November 15, 1977 are null and void.[21]

DOE contends that this constitutional claim was never raised to the administrative

---

**19.** *See United States v. Tucker Truck Lines, Inc.*, 344 U.S. 33, 73 S.Ct. 67, 97 L.Ed. 54 (1952).

**20.** Having determined that the allegations of Count II should not be dismissed from the case on the grounds of waiver, the Court will not now proceed to evaluate their merits. Although the parties have engaged in extensive briefing on the question of the applicable standard, and although that effort may help to expedite subsequent proceedings in this matter, the Court notes that no cross motion for summary judgment on Count II was filed by Tenneco. The question of waiver was therefore the sole issue concerning Count II that was properly presented for decision at this juncture.

**21.** Doc. No. 10, ¶ 73.

agency and that the usual exhaustion rule should preclude its consideration by the reviewing court. Tenneco concedes that the due process issue was never directly litigated before the administrative agency,[22] but rather the Company relies principally upon *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), to establish that the exhaustion concept is inapplicable to constitutional issues.

In *Eldridge*, the Supreme Court was called upon to decide whether the district court had power to review the decision of the Secretary of Health, Education and Welfare in a case where the plaintiff-claimant had concededly failed to exhaust all avenues of review within the agency and had never raised his claim that "the Fifth Amendment requires that prior to the termination of Social Security disability benefit payments the recipient be afforded an opportunity for an evidentiary hearing." [23] In considering whether Eldridge's failure to raise the due process argument to the agency resulted in a waiver of that claim, the Court stated:

> The fact that Eldridge failed to raise with the Secretary his constitutional claim to a pretermination hearing is not controlling. . . . It is unrealistic to expect that the Secretary would consider substantial changes in the current administrative review system at the behest of a single aid recipient raising a constitutional challenge in an adjudicatory context. The Secretary would not be required even to consider such a challenge.[24]

In a footnote to the quoted passage the Court noted that

> If Eldridge had exhausted the full set of available administrative review procedures, failure to have raised his constitu-

tional claim would not bar him from asserting it later in a district court. *Cf. Flemming v. Nestor*, 363 U.S. 603, 607, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960).[25]

In *Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977), the Court reaffirmed its commitment to the principle that constitutional questions need not be presented to an administrative agency as a prerequisite for their consideration by a reviewing court. In *Sanders*, the court characterized *Eldridge* and *Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975) (another case where a constitutional claim was held cognizable in the absence of prior presentation to the agency), as exceptions to the traditional exhaustion requirements. The court noted that

> [c]onstitutional questions obviously are unsuited to resolution in administrative hearing procedures and, therefore, access to the courts is essential to the decision of such questions. . . . Thus, those cases merely adhered to the well-established principle that when constitutional questions are in issue, the availability of judicial review is presumed, and we will not read a statutory scheme to take the "extraordinary" step of foreclosing jurisdiction unless Congress' intent to do so is manifested by " 'clear and convincing' " evidence. 422 U.S., at 762, 95 S.Ct. 2457; *Johnson v. Robison*, 415 U.S. 361, 366–67, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974).[26]

In answer to the foregoing line of Supreme Court cases, DOE argues that the rule they assert is applicable to cases where the constitutional challenge addresses the basic validity of a statute or administrative proceeding. DOE seeks to distinguish the case at bar from *Salfi, Eldridge* and *Sanders* on the grounds that Tenneco's due proc-

---

**22.** Tenneco does, however, argue that the FEA and DOE were on notice of its intent to raise Count V's constitutional claim because the claim was included in a complaint filed May 16, 1977 in the Southern District of Texas (Civ. No. H–77–754). This Court's present disposition of DOE's motion to dismiss Count V on the grounds of waiver obviates the need to determine whether inclusion of the constitutional claim in a collateral law suit would provide notice to the agency sufficient to satisfy the exhaustion requirements.

**23.** 424 U.S. at 323, 96 S.Ct. at 897.

**24.** *Id.* at 329–30, 96 S.Ct. at 900.

**25.** *Id.* at 329, n. 10, 96 S.Ct. at 900, n. 10.

**26.** *Califano v. Sanders*, 430 U.S. 99, 109, 97 S.Ct. 980, 986, 51 L.Ed.2d 192 (1977).

ess claims raise factual questions that are particularly well-suited to the application of the agency's expertise. Although some textbook support may be found for DOE's proposed distinction,[27] DOE has provided no case support for its position and the Court finds no indication in the Supreme Court's recent language that such a distinction is to be drawn.

DOE's motion to dismiss Count V of Tenneco's amended complaint on the grounds that the claim it presents has been waived will be denied, because no exhaustion requirement can be applied to such a claim.

### C. COUNT VII: ESTOPPEL OF DOE TO PROHIBIT RETROACTIVE REALLOCATION OF NON–GASOLINE COST INCREASES

■ Count VII of Tenneco's amended complaint alleges that:

The DOE is estopped from refusing to permit Tenneco to reallocate to gasoline the bank of unrecouped cost increases attributable to the production of "other covered products," extant during the period January 1975 to January 1976, to support its gasoline prices charged during that period.[28]

When the quoted statement of its claim is read in conjunction with Tenneco's factual allegations, it becomes clear that in substance Tenneco contends that the advice given it in 1973 by CLC officials lead the Company to believe that retroactive reallocation of non-gas costs would be permissible and that Tenneco's reliance upon that advice has created an estoppel against DOE's prohibition on retroactive reallocation.

Although DOE admits that the estoppel issue was raised before the agency with respect to the question of how the May 1973 base price of gasoline should be calculated, DOE insists that the question whether non-gas cost increases may be reallocated to support assertions of increased gasoline costs subsequent to 1973, and therefore to justify higher pricing under the regulations, is an issue separate and distinct from that involving base price calculations. It is DOE's position that Tenneco never claimed before the agency that it was estopped from prohibiting retroactive reallocation of non-gas costs; therefore DOE urges the Court to view this estoppel argument as waived.

Tenneco does not urge the inapplicability of the waiver doctrine[29] to the issue embodied in Count VII, but rather argues that several of its submissions to the DOE and FEA enforcement proceedings fairly raised this issue. The items contained in the administrative record upon which Tenneco relies to support this argument will be considered seriatim.

First, Tenneco points to its Response to the Notice of Probable Violation as evidence that the Company asserted that DOE was estopped from enforcing the entirety of the Remedial Order against Tenneco. This document does indeed set forth a clear estoppel claim based on Tenneco's reliance upon the advice of CLC officials, but as

---

**27.** See K. C. Davis, *Administrative Law Text* § 20.04 (1958):

A fundamental distinction must be recognized between constitutional applicability of legislation to particular fact and constitutionality of the legislation. When a tribunal passes upon constitutional applicability, it is carrying out the legislative intent, either express or implied or presumed. When a tribunal·passes upon constitutionality of legislation, the question is whether it shall take action which runs counter to the legislative intent. We commit to administrative agencies the power to determine constitutional applicability, but we do not commit to administrative agencies the power to determine constitutionality of legislation. Only the

courts have authority to take action which runs counter to the express will of the legislative body.

Publication of this treatise, of course, predated the *Salfi, Eldridge* and *Sanders* cases, but in his supplement, Professor Davis is highly critical of the analysis found in those cases and he does not expressly discard the distinction drawn in the above-quoted paragraph. See K. C. Davis, *Administrative Law of the Seventies* §§ 20.00–.08 (July, 1977 Supplement).

**28.** Doc. No. 10, ¶ 77.

**29.** See *United States v. Tucker Truck Lines, supra,* and *Unemployment Compensation Commission v. Aragan, supra.*

DOE contends, the advice cited addressed only the method of calculating Tenneco's May 1973 base cost of gasoline.[30] Likewise, Tenneco's characterization of the advice it received from CLC as set forth in its Appeal of the Remedial Order,[31] addresses the issue of how base price should be calculated. There is no question but that Tenneco repeatedly argued, as it does in Count VI of its amended complaint, that the agency's regulations should be interpreted to permit retroactive reallocation of non-gas costs,[32] but nowhere in the documents to which this Court has been cited can there be found what the Court views, in substance, to be the nub of Tenneco's Count VII claim: i. e., the claim that the Company was in some way assured that retroactive reallocation would be permitted.

Tenneco argues that the agency was in fact on notice of the estoppel claim as to retroactive reallocation, but the documents upon which Tenneco relies do not support such a conclusion. The Decision and Order of June 17, 1977 denying Tenneco's appeal from the Remedial Order merely references a general estoppel argument challenging the Order's propriety and does not treat the issue specifically enough to warrant the inference that Tenneco now asks the Court to draw.[33] The characterization of Tenneco's estoppel claim in the April 12, 1978 letter from DOE's Office of Special Counsel for Compliance to the director of the agency's Office of Administrative Review is equally unavailing to Tenneco's position. The letter, in part, recites Tenneco's allegation

> that during the period from January 1975 through January 1976, it maintained a bank of unrecouped product cost increases attributable to "other covered products" which, had it known of the pricing violations found in the Remedial Order of

February 2, 1977, it could have reallocated to support its gasoline prices and eliminate a substantial portion of the overcharges, . . .[34]

This view of Tenneco's argument is tantamount to that held by the Court after reviewing pertinent segments of the administrative record: it seems clear that Tenneco's submissions to DOE and FEA characterized the problem concerning reallocation of non-gas cost increases as exemplary of detriment suffered by the Company in reliance upon the alleged assurances by CLC officials that Tenneco's May 1973 base cost figure could be calculated in a manner other than that which DOE now seeks to impose.

It is not the element of detriment that gives rise to an estoppel, but rather the presence of representations upon which detrimental reliance is based. In the absence of some notice to the administrative agency that Tenneco relied upon CLC officials' advice concerning the reallocation regulations, this Court cannot conclude that the issue was ever raised in the administrative proceedings below. On the basis of the principal articulated in *United States v. Tucker Truck Lines*, 344 U.S. 33, 73 S.Ct. 67, 97 L.Ed. 54 (1952), it must be deemed waived and inappropriate for consideration by this Court. DOE's motion to dismiss Count VII will be granted.

D. *COUNT VIII: PROCEDURAL IN-VALIDITY OF DOE'S PROHIBI-TION ON REALLOCATION OF NON–GAS PRODUCT COST IN-CREASES*

In substance, Count VIII of Tenneco's amended complaint[35] alleges that DOE's refusal to permit retroactive reallocation of non-gas product cost increases

---

**30.** Exhibit A, pp. 9–10. (The Exhibits referenced in this Opinion are portions of the administrative record filed with the Court on July 28, 1978, and designated Doc. Nos. 21, 21A, 21B and 21C.)

**31.** Exhibit D, p. 38, at 4–9.

**32.** *See* Appeal of Remedial Order, Exhibit D, p. 38 at 9; Request for Modification, Exhibit F, p.

17; Appeal of Revised Remedial Order, Exhibit G, p. 26 at 3–4 and 10–11.

**33.** Exhibit D, p. 54, at 3.

**34.** Exhibit G, p. 13 at 2–3.

**35.** Doc. No. 10, ¶¶ 78–80.

constitutes an attempt to broaden the scope and to depart from the intent of the agency's regulations, and that such changes are invalid because not made in accordance with the rule-making procedures mandated by the Administrative Procedure Act, 5 U.S.C. § 553(b) and (c), the Department of Energy Organization Act, Sections 501(b)(1) and (c)(1), and the Federal Energy Administration Act, 15 U.S.C. § 766(i)(1)(B) and (C). Both parties agree that the procedural deficiency claim raised in this Count was never argued by Tenneco to the administrative agency.

To excuse its failure to raise the Count VIII claim, Tenneco first notes that it had no obligation or opportunity to assert such a claim prior to DOE's Decision and Order of November 15, 1977 in which the agency first decided that retroactive reallocation of non-gas cost increases was contrary to its regulations. Tenneco's amended complaint specifically states that the decision the Company alleges to be procedurally defective rule making was embodied in the November 15, 1977 Order, and the Court agrees that the objections embodied in Count VIII would have been hypothetical and premature if raised in anticipation of the agency's position as set forth in that Order. As Tenneco notes, the FEA's June 17, 1977 Decision and Order, denying the Company's appeal from the agency's original Remedial Order, specifically invited Tenneco to provide evidence of unrecouped increased non-gas product costs. DOE stresses the June 17, Order's disclaimer that "no determination is being made at this time with regard to the validity of the claim which Tenneco raises," [36] and argues that the Company should have recognized the possibility that retroactive reallocation would be prohibited. The Court, however, cannot require Tenneco to mount a procedural attack on an agency's decision at a time when that decision is merely a future possibility and when its details are unknown.

To excuse its failure to raise the Count VIII claims in its submissions subsequent to the November 15 Decision and Order, Tenneco contends that that Order was final and ripe for judicial review, that the Company filed its initial complaint in this action prior to seeking any further administrative relief, and that the relief it sought (in the form of an appeal from the Revised Remedial Order) was optional and did not require Tenneco to raise all issues it wished to argue before the reviewing Court. The Company cites the case of *Levers v. Anderson*, 326 U.S. 219, 66 S.Ct. 72, 90 L.Ed. 26 (1945), for the proposition that the exhaustion doctrine should not be applied to require filing of an optional request for reconsideration. DOE apparently does not contest Tenneco's characterization of the agency's reconsideration proceedings as optional, but rather argues that the Supreme Court's decision in *American Farm Lines v. Black Ball Freight Service*, 397 U.S. 532, 90 S.Ct. 1288, 25 L.Ed.2d 547 (1970), mandates the conclusion that because Tenneco *in fact* chose to seek further administrative relief, the Company was obliged to raise all its claims in the appeal to the Revised Remedial Order, and that those not raised must be deemed waived.

The *American Farm Lines* case addressed the question whether an administrative agency (the Interstate Commerce Commission) was jurisdictionally empowered to grant a petition for rehearing filed by one litigant in a multi-party proceeding, at a time when another party to the administrative proceeding had already filed suit and established the jurisdiction of the reviewing district court. The Supreme Court held that:

> This power of the Commission to reconsider a prior decision does not necessarily collide with the judicial power of review. For while the court properly could provide temporary relief against a Commission order, its issuance does not mean that the Commission loses all jurisdiction to complete the administrative process. It does mean that thereafter the Commission is "without power to act inconsistently with the court's jurisdiction." *In-*

36. Exhibit D, p. 54 at 4.

land Steel Co. v. United States, 306 U.S. 153, 160, 59 S.Ct. 415, 83 L.Ed. 557.[37]

As was true in the *American Farm Lines* case, federal court jurisdiction had been established by Tenneco's December 15, 1977 filing of its original complaint prior to taking an appeal from the Revised Remedial Order. The Supreme Court's holding thus determines that the pendency of the present action did not preclude the DOE from considering the claim now raised in Count VIII and revising its orders in response to that claim, had it been presented to the agency. Such action by the DOE would not have been inconsistent with this Court's jurisdiction. *American Farm Lines,* however, did not deal with the question whether a request for administrative reconsideration, where such a procedure exists, is mandatory prior to the seeking of judicial review. The Supreme Court, however, did note that "[i]n multi-party proceedings, such as the present one, some may seek judicial review and others may seek administrative reconsideration,"[38] and it must therefore be assumed that the Court had not changed its previously expressed view that reconsideration proceedings need not be exhausted prior to review. *See Levers v. Anderson, supra.* The *American Farm Lines* case, nevertheless, sheds no light on DOE's claim that once the reconsideration mechanism is invoked, all issues that could be raised must be.

Persuasive authority in support of DOE's argument may be found in *Outland v. Civil Aeronautics Board,* 109 U.S.App.D.C. 90, 284 F.2d 224 (1960), which was cited with approval by the Supreme Court in *American Farm Lines* and which held that a timely filing of a petition for reconsideration tolls the period for filing a petition for a judicial review mandated by the Administrative Procedure Act ("APA"). The Court of Appeals for the District of Columbia recognized that Section 710 of the APA, 15 U.S.C. § 704, echoes the holding of *Levers v.*

*Anderson, supra,* that the filing of a motion for rehearing was not necessary to the exhaustion of administrative remedies. The court, however, went on to state that the *Levers* holding was inapplicable to questions of finality and ripeness for judicial review where a motion for rehearing had in fact been filed. The rationale supporting the *Outland* decision is applicable to the case at bar:

> But when the party elects to seek a rehearing there is always a possibility that the order complained of will be modified in a way which renders judicial review unnecessary. Practical considerations, therefore, dictate that when a petition for rehearing is filed, review may properly be deferred until this has been acted upon. But the contrary result reached by the Ninth Circuit has caused parties to file so called "protective" petitions for judicial review while petitions for rehearing before the Board were pending. A whole train of unnecessary consequences flowed from this: the Board and other parties may be called upon to respond and oppose the motion for review; when the Board acts, the petition for judicial review must be amended to bring the petition up to date.[39]

Tenneco's filing of the nonmandatory appeal from the Revised Remedial Order, as well as its suit in district court, placed DOE in the ambiguous position anticipated by the above-quoted passage, as is noted by the Company's letter of April 27, 1978 to the agency's Director of the Office of Hearing and Appeals. There Tenneco noted that "the DOE can decline to reconsider its position on this matter in view of its final order of November 15, 1977, and Tenneco's subsequent federal court complaint."[40] Having chosen to seek further redress from DOE's administrative proceedings, while filing a "protective" suit in this Court, Tenneco cannot now be heard to complain because it did

---

**37.** 397 U.S. at 541, 90 S.Ct. at 1294.

**38.** *Id.*

**39.** 109 U.S.App.D.C. 90, 93, 284 F.2d 224, 227–28.

**40.** Exhibit G, p. 4 at 2.

not put its best foot forward before the agency. Although it would have been possible for Tenneco to have limited the issues raised by its appeal of the Revised Remedial Order to questions involving reallocation of nonproduct costs—the only area expressly addressed by the Revised Remedial Order [41] —Tenneco also chose to proffer a lengthy argument concerning the substantive correctness of the agency's November 15, 1977 holding prohibiting retroactive reallocation of non-gas product cost increases. The Company has suggested no justification for permitting it to advance one prong of its attack on this reallocation decision while withholding the argument that now forms the basis of Count VIII. Tenneco's April 27, 1978 letter expressed the belief "that DOE should welcome the opportunity to reassess its position . . . ," [42] and it is concluded that the agency should have been given a fair opportunity to do so, as anticipated by the doctrine of exhaustion of administrative remedies.

DOE's motion to dismiss Count VIII of Tenneco's amended complaint will be granted.

## III. DISCOVERY MOTIONS

▮▮▮▮ Remaining for disposition are Tenneco's motion to compel discovery and DOE's motion for a protective order, which were filed in response to Plaintiff's First Interrogatories and Request for Production of Documents.[43] DOE launches two broad attacks on the propriety of Tenneco's discovery requests. First the agency argues that discovery is improper because it seeks to obtain material outside the administrative record made in the agency proceedings below. Under the standard of review of an administrative agency's decision conceded to be applicable here, the reviewing court may look only to the administrative record actually before the agency rendering the decision to ascertain whether that record contains substantial evidence to support the result reached by the agency. In order to

avoid eviscerating the notion that court review should be limited and should not blossom into a de novo trial, it has been held that:

> [The] focal point for judicial review should be the administrative record already in existence, not some new record made additionally in the reviewing court. Camp v. Pitts, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973).

See also Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). DOE contends that because the interrogatories and document requests seek information not contained within the administrative record certified by the agency to this Court, they should be held improper.

As a corollary to this argument, DOE claims that the discovery requests are also improper because they seek to probe the mental processes of the decision-makers within the agency and to determine how the agency reached the decision in the proceedings below. United States v. Morgan, 313 U.S. 409, 422, 61 S.Ct. 999, 85 L.Ed. 1429 (1941), establishes the basic premise that "mental process discovery" is ordinarily to be avoided, and it is clear from Overton Park, supra, that "there must be a strong showing of bad faith or improper behavior before such an inquiry may be made." 401 U.S. at 420, 91 S.Ct. at 825.

Tenneco does not contest the general validity of the propositions advanced by DOE in support of its motion for a protective order.[44] Rather, Tenneco asserts that there are a variety of other theories that carve out exceptions to the general rule limiting discovery beyond the administrative record, and which permit the discovery presently sought. Tenneco also contends that the mental process privilege is simply factually irrelevant to the items of information sought, and suggests that DOE is tacitly seeking to advance an executive privilege

---

41. Exhibit G, p. 61.

42. Id., p. 4 at 2.

43. Doc. No. 9.

44. Both parties agree that there has been no allegation or showing of bad faith or improper conduct in this case.

claim without fulfilling the requirements that precondition a valid assertion of such a privilege.

The issues joined by the parties' present discovery motions have been extensively litigated in this District and elsewhere. *See Gulf Oil Corp. v. Schlesinger*, 465 F.Supp. 913 (E.D.Pa.1979); *Petrolane, Inc. v. DOE*, 79 F.R.D. 115 (C.D.Cal.1978); *Getty Oil v. DOE*, 1 CCH Energy Management ¶ 9741 (D.Del.1978); *Phillips Petroleum Company v. DOE*, C.A. No. 77–90 (D.Del. Sept. 7, 1977). Indeed Judge Stapleton's recent opinion in *Amoco Production Company v. DOE*, C.A. No. 78–463 (D.Del. May 29, 1979), provides a concise review of the case law applicable to determining the proper scope of discovery in the present case.

The statement of counsel for DOE at oral argument on the present motions makes it clear that the agency views as improperly decided those cases in this District that have recognized the appropriateness of a broader scope of discovery than that presently urged by DOE. "Despite this well-established body of case law, the DOE seeks to relitigate the issues decided there." *See Amoco, supra*, slip op. at 11. To the extent that DOE requests this Court to depart from the principles articulated in the above-cited decisions, the Court again declines to do so. It is of the opinion that those cases are soundly decided and will adhere to those holdings unless instructed to do otherwise by a higher court. *See also Pierson v. United States*, 428 F.Supp. 384 (D.Del.1977); *A. O. Smith v. FTC*, 403 F.Supp. 1000 (D.Del. 1975).

Tenneco correctly asserts that it is entitled to discover any materials necessary to complete the administrative record. "Where there is to be a review on the record, the parties seeking review and the Court have a right to a complete administrative record and, when a showing is made that it may not be complete, limited discovery is appropriate to resolve that question." *Getty Oil v. DOE, supra*, at 9893. See also *Shell Oil Company v. DOE*, C.A. No. 79–134, slip op. at 2 (D.Del. May 31, 1979); *Petrolane v. United States, supra*, at 119. The complete administrative record consists of all the documents and materials that were directly or indirectly considered by the decision-makers at the time the decisions were rendered. *Pierson v. United States, supra*, at 391–92. In the present case, Tenneco has urged, and a review of the materials certified to this Court would also suggest, that the certified administrative record may be incomplete.[45] The transmitted record contains primarily Tenneco's submissions to the agency, along with the formal Decisions and Orders issued by FEA and DOE. It strains the Court's imagination to assume that the administrative decision-makers reached their conclusions without reference to a variety of internal memoranda, guidelines, directives, and manuals, and without considering how arguments similar to Tenneco's were evaluated in prior decisions by the agency. DOE may not unilaterally determine what shall constitute the administrative record and thereby limit the scope of this Court's inquiry.

The theory permitting discovery necessary to complete the administrative record is sufficient to support the propriety of virtually all of Tenneco's interrogatories and document requests. In responding to the discovery requests, however, DOE would be obliged to provide only that information and those documents that were directly or indirectly considered by its deci-

---

**45.** DOE argues that Tenneco has never alleged the incompleteness of the administrative record, but in view of the fact that the record was certified to the Court in July, 1978—well after the filing of Tenneco's original and amended complaints—it is clear to this Court that Tenneco has asserted the record's incompleteness at the earliest practical opportunity by raising the claims in these discovery proceedings. The Court is also unpersuaded by DOE's contention that Tenneco may not now seek discovery of materials that it never sought from DOE during the course of the administrative proceedings. The government's present resistance to producing internal agency documents suggests that such requests would have been denied, and DOE has made no showing that it in fact permits any form of discovery during the agency proceedings.

sion-makers, were this theory the only one available to support Tenneco's requests. Tenneco, however, properly notes that this Court will be called upon to interpret the meaning of the agency's regulations in order to determine whether DOE and FEA acted arbitrarily or beyond the scope of their authority and in order to evaluate Tenneco's remaining claim of procedural impropriety. Tenneco is therefore entitled to discovery of all materials relevant to the agency's contemporaneous construction of its regulations. In this case, there has been a substantial allegation that the base price and reallocation regulations brought under scrutiny by Tenneco's complaints were ambiguous and subject to multiple interpretations.[46] Likewise, the continued uncertainty surrounding the proper meaning to be ascribed to the terms "inequity" and "gross inequity" as used to govern the granting of exception relief persuades this Court that evidence of contemporaneous construction will be relevant and necessary when it faces the task of construing those terms. As the Court noted in *Amoco v. DOE, supra,* slip op. at 4–5:

> In circumstances of this kind, the courts have sought assistance in construing the regulation[s] by looking to the statements and actions of the agency personnel who have had the responsibility of implementing and enforcing the contested regulatory provisions ("contemporaneous constructions"). *See Getty Oil Co. v. DOE, supra; Phillips Petroleum Co. v. DOE,* Civil Action No. 77–90 (D.Del. September 7, 1977 and October 11, 1977); *Petrolane, Inc. v. DOE,* 79 F.R.D. 115 (C.D.Calif. 1978); *Gulf Oil Corp. v. Schlesinger,* 465 F.Supp. 913 (E.D.Pa.1979). In view of their technical expertise, their exposure to industry practice and problems, and their on-going responsibility with respect to interpreting the regulations in the

course of day-to-day enforcement, the statements and actions of these administrators have been considered significant even in the absence of an approval of their views by the agency, qua agency. *Standard Oil Co. v. DOE,* No. 6–13 (TECA 1978).

The vitality of Tenneco's argument concerning the propriety of "contemporaneous construction" discovery expands the duty of DOE in responding to the Company's discovery requests and requires the production of information concerning the construction given to the regulations contemporaneous with their issuance and subsequent application by the agency. Consistent with the approach of the court in *Amoco v. DOE, supra,* slip op. at 8, the government's responsibility will be to provide items generated during the period subsequent to the issuance of any Notice of Proposed Rulemaking applicable to the regulations here involved[47] and continuing to the present. *See also Petrolane, Inc. v. DOE, supra; Phillips Petroleum Co. v. DOE, supra.*

As recognized by the court in *Amoco,* discovery relating to contemporaneous constructions need not be limited to "statements made by the agency qua agency, to statements of 'high ranking officials', or to statements disseminated to the public." Slip op. at 8. The internal memoranda, directives and guidelines generated and disseminated at a variety of levels are proper items of discovery, and it is therefore possible that information, materials and documents encompassed by Tenneco's discovery requests are subject to claims of privilege. DOE has asserted that each of the interrogatories necessarily encompasses information that would result in an impermissible invasion of the decision-makers' mental processes.[48] The Court notes that all of the

---

**46.** The affidavit of Mr. Charles Owens, Exhibit B, p. 130 at 2, suffices to demonstrate that there could be differing views of the meaning of the base price and reallocation provisions. The Court is unpersuaded by DOE's insistence that by requesting the agency not to require "literal" application of the regulations to the Compa-

ny's situation, Tenneco has admitted that the regulations were unambiguous.

**47.** If there was no applicable Notice of Proposed Rulemaking, DOE's search should commence with the effective dates of the price rule, reallocation and exceptions relief regulations.

**48.** *See Overton Park, supra.*

cases cited by DOE and found by the Court in which the mental process privilege has been developed involved efforts to depose decision-makers concerning their method and rationale for decision. Nonetheless, whether this privilege can ever be applied to protect oral or written communications,[49] and indeed whether the privilege is one separate and distinct from executive privilege, are questions the Court need not presently decide. The government has not raised its claims of privilege with regard to particular items. DOE must identify documents or communications with sufficient specificity to enable this Court meaningfully to evaluate whether the information sought involves the internal deliberative process by which a decision or agency position was reached.[50]

Tenneco suggests that the privilege that DOE in reality seeks to assert is executive privilege.[51] If this is the case, Tenneco is correct in arguing that DOE has not met the formal requirements for raising the privilege demanded in *A. O. Smith, supra,* at 1016, and that the privilege would be deemed inapplicable to the discovery of factual materials.[52] The "application of this privilege requires a balancing which can only be done with reference to specific documents . . . .,"[53] and it must therefore be raised with the same particularity required in the assertion of a mental process privilege.

Interrogatories 3 and 4 of Tenneco's discovery requests, however, on their face seek discovery that goes "beyond the point where the likelihood of aid in the interpretive task justifies the burden of the search."[54] Interrogatories 3 and 4 seek to identify all studies, surveys, analyses, research projects, and any other inquiries, or reviews concerning the extent to which statutory objectives or other agency goals would be furthered by precluding retroactive reallocation of non-gas product costs increases and by selecting May, 1973 as the regulatory base month. As Judge Stapleton characterized a similar request in *Amoco,*[55] "plaintiffs claim the right to have the DOE compile the equivalent of an administrative record with respect to each contemporaneous construction by agency personnel." DOE will therefore not be required to respond to interrogatories 3 and 4, and their related document requests, except to the extent that the items therein sought were in fact relied upon, directly or indirectly, by the decision-makers in reaching the decisions challenged in these proceedings. If the decision-makers actually relied upon the studies and analyses sought in interrogatories 3 and 4, they are in fact a part of complete administrative record in this case, and are properly discoverable on that basis.

The Court's rulings on the propriety of Tenneco's specific discovery requests will be reflected in an accompanying order.

---

**49.** *See Pierson, supra,* at 392.

**50.** See the guidelines established for asserting executive privilege set forth in *A. O. Smith, supra,* at 1015.

The Court is unpersuaded by Tenneco's argument that by filing the present motion for a protective order, DOE has waived the right to advance further objections to the discovery Tenneco seeks. In view of the magnitude of Tenneco's discovery requests, fundamental fairness requires that DOE not be required to conduct a search of its files as broad as that demanded by Tenneco in order to raise objections to producing specific items, while simultaneously bringing a challenge to the breadth of the company's requests.

**51.** *See United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974).

**52.** *A. O. Smith, supra,* at 1015.

**53.** *Amoco, supra,* slip op. at 15.

**54.** *Id.* at 6.

**55.** *Id.* at 6–7.