NGUYEN, Circuit Judge,
concurring:
I agree with the majority that Proposition 100 violates substantive due process. However, the majority assumes, without deciding, that Proposition 100 was not motivated by an improper punitive purpose. I write separately to address the extraordinary record of legislative intent, which I believe demonstrates that Proposition 100 was intentionally drafted to punish undocumented immigrants for their “illegal” status, even if they pose no flight risk or danger to the community. This record also sheds light on why the law’s provisions are excessive in so many respects. Acknowledging the improper legislative purpose in this case not only aids our substantive due process analysis, but also reaffirms our constitutional commitment to provide due process to all, regardless of immigration status.
I
The Supreme Court has instructed that “[t]o determine whether a restriction on liberty constitutes impermissible punishment or permissible regulation, we first look to legislative intent.” United States v. Salerno, 481 U.S. 739, 747, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) (citing Schall v. Martin, 467 U.S. 253, 269, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984)). Absent evidence of express intent to punish, the analysis depends on whether the restrictions are reasonably connected to a legitimate purpose, and whether they appear excessive in relation to that purpose. Bell v. Wolfish, 441 U.S. 520, 538-39, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); Salerno, 481 U.S. at 747, 107 S.Ct. 2095. However, whether a statute is intended as punitive, or excessive in relation to some legitimate purpose, are not analytically distinct inquiries. One informs the other:
Thus, if a particular restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to “punishment.” Conversely, if a restriction or condition is not reasonably related to a *793 legitimate goal — if it is arbitrary or purposeless — a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees.
Bell, 441 U.S. at 539, 99 S.Ct. 1861 (footnote omitted). Conceptually, this makes sense. Because the ultimate question is whether or not a statute constitutes impermissible punishment,' we may consider both what legislators had to say about the law they crafted, and the extent to which the law was drawn accordingly.
Significantly, “the mere invocation of a legitimate purpose will not justify particular restrictions and conditions of confinement amounting to punishment.” Schall, 467 U.S. at 269, 104 S.Ct. 2403. Even if the restrictions “serve legitimate regulatory purposes, it is still necessary to determine whether the terms and conditions of confinement under [the challenged statute] are in fact compatible with those purposes.” Id. (citing Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168-69, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963)).
These inquiries do not lend themselves to a rigid, formulaic approach. Rather, “each case has turned on its own highly particularized context.” Flemming v. Nestor, 363 U.S. 603, 616, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960). Where the record of legislative intent is inconclusive, the Supreme Court has not hesitated to consider — rather expansively, in fact — the nature and history of the restraint, among other factors. Mendoza-Martinez, 372 U.S. at 168-69, 83 S.Ct. 554. See also Bell, 441 U.S. at 538, 99 S.Ct. 1861 (“The factors identified in Mendozar-Martinez provide useful guideposts in determining whether particular restrictions and conditions accompanying pretrial detention amount to punishment in the constitutional sense of that word.”).
The facts of this case illustrate precisely why legislative intent and tailoring have been considered two sides of the same coin. I therefore turn to some of the record evidence that informs my judgment regarding the unconstitutionality of Proposition 100.
II
A
Proposition 100 was sponsored by former State Representative Russell Pearce. Introducing the bill to the Senate Judiciary Committee, Representative Pearce noted that a majority of Americans “want the border secured, [and] our laws enforced,” and described Proposition 100 as a “very reasonable approach” to accomplishing those ends.[1] Senate Judiciary Committee Meeting on H.B. 2889 and H. C.R.2028, Mar. 28, 2005, 47th Leg., 1st Regular Sess. (Ariz.2005). He described the purpose of Proposition 100: “[W]hen people are in this country illegally and they commit a serious felony they ought not to be bondable.... ” Id. Although he alluded genérally to the supposed dangers that “violent *794 aliens” pose to the public, he did not cite a single example or any other evidence of the problem,[2] and instead elaborated:
I mean, you know bad enough you’re illegal but you commit a serious crime you ought not to be bondable unless you’re released after prosecution, after you do your time to ICE and then to be deported. In fact, all illegal aliens in this country ought to be detained, debriefed, and deported....
Id. He continued:
Violent criminals in our society who, again, may not be brought to justice if they’re released and should not be released first of all, according to federal law, but they’re to be deported, so seriously, they’ve committed [a] serious crime, I think that this just simply bridges the gap, a loophole in the law that would allow people who are not in this country [ jlegally who have no business to be released if they commit any crime, they have no business being released if they commit no crime, no additional crime [bejcause they’re already in this country illegally.
Id. (emphasis added). Maricopa County Attorney Andrew Thomas, whose office played a central role in drafting Proposition 100, also testified before the Committee. Thomas explained the purpose of the bill as follows:
I believe it is time to end the first class tickets that we have been giving from our jails for serious criminals.... [Certain serious criminals currently enjoy this simply because of their status as illegal immigrants and I believe that we need to take action to put an end to this.
Id. In his testimony, Thomas, much like Representative Pearce, alluded to “numerous examples of serious and violent criminals that Maricopa County Attorney’s Office has prosecuted in the past that have escaped justice” — but also could not cite a single case to support his position.[3] Testifying later in these proceedings, Thomas again could not identify a single such case, and further conceded that his office did not possess any data or information illustrating the problem.
During the same Judiciary Committee hearing, State Senator Bill Brotherton raised concerns about the breadth of the bill. Senator Brotherton gave an example — a student who overstayed his or her visa and was charged with pirating music online would automatically be denied bail, even though a judge might not consider such a defendant a flight risk. Senate Judiciary Committee Meeting on H.B. 2389 and H. C.R.2028, Mar. 28, 2005, 47th Leg., 1st Regular Sess. (Ariz.2005). Representative Pearce dismissed this concern as an attempt to “muddy the waters,” id., and reiterated the intent of the bill:
The fact that we would continue to try to put some veil over what’s really happening and try to paint this face of this poor student who overstays his visa, ev *795 erybody knows what this is targeting. This is, you know, and my issue is very simple. This bill doesn’t go as far as it ought to go. This is a very modest bill. If you’re in this country illegally you ought to be detained, deported[,] end of story.
Id. Similarly, when Senator Brotherton expressed his concern that altering a lottery ticket ought not to be a non-bondable offense, State Senator Jack W. Harper interjected:
To that point, what part of illegal don’t we understand? Illegal aliens shouldn’t be able to get bond for anything let alone a Class 1, 2, or 3 felony____ We need to just get off the subject of lottery ticket[s] because fraudulently altering lottery tickets is a crime and they shouldn’t make bail for anything, so let’s just move on.
Id. (emphases added). Ultimately, the Committee amended the legislation to specify that, should the ballot measure pass, the Legislature would reserve to itself the task of defining “serious felony offense.” To that end, Representative Pearce introduced legislation that would define “serious felony offense” as entailing any class 1, 2, 3, or 4 felony, as well as aggravated driving under the influence. House Floor Meeting on H.B. 2580, Mar. 7, 2006, 47th Leg., 2nd Regular Sess. (Ariz. 2006). That bill was eventually passed by the Legislature, and signed into law.
Months later, Proposition 100 was referred to the state’s voters. The ballot materials did not inform voters of the definition of “serious felony offense,” or that it included many non-violent offenses. Instead, in a statement of support on the ballot, Representative Pearce warned voters of “[ljarge, well-organized gangs of illegal aliens,” and the need to keep such “dangerous thugs in jail rather than releasing them onto the streets.” Publicity Pamphlet Issued by Janice K. Brewer, then-Arizona Secretary of State, Ballot Propositions & Judicial Performance Review, General Election, Nov. 7, 2006, available at http://www.azsos.gov/election/2006/ info/pubpamphlet/english/ProplOO.htm. Maricopa County Attorney Thomas urged voters[4]:
Thanks to an amendment approved overwhelmingly by voters in 2002, the Arizona Constitution now denies bail to defendants accused of rape and child molestation. This proposition similarly would deny bail to illegal immigrants who pose a clear danger to society and who too often use our border as an escape route. Our state constitution was not intended to “bail out” illegal immigration. I urge you to vote yes to end this abuse of our criminal justice system.
Id. Don Goldwater, a gubernatorial candidate, placed this statement on the ballot:
I commit to you that, as your Governor, I will apply all legal measures to protect and defend Arizonans from the illegal invasion. This Ballot Measure addresses one area that needs to be resolved in this fight to secure our borders and reduced the level of crime in our neighborhoods.
*796 It is embarrassing to have our state lead the nation in crime. Unfortunately, the current governor has vetoed ten separate bills sent to her desk the legislature that were written to protect you from illegal immigration.
Id. By contrast, the sole statement of opposition to Proposition 100, signed by several individuals, cautioned:
Prop 100 would ... create a sub-class of people within the justice system based solely on race or national origin, and unnecessarily penalize people who pose little or no risk to the community. This proposition would do nothing more than institutionalize bias and discrimination in the justice system, at taxpayer expense.
Id. Voters approved the constitutional amendment.
After the popular vote, follow-on legislation was introduced that would have lowered the standard of proof applicable to the determination of immigration status from “proof evident and presumption great,” to “preponderance of the evidence.” Pearce rose on the floor of the House to oppose the bill because, in his view, it did not lower the standard even further, to “probable cause.” In his opposition, Pearce repeatedly emphasized the immigrants’ “illegal” status:
You don’t need to make that kind of a standard for preponderance or anything else to the charge[,] they are here illegally. ... they are here illegally, they have no business being released no [matter] what the charge in reality because they’re a flight risk. They’re here illegally. They need to be turned over to ICE
House Floor Meeting on S.B. 1265, June 7, 2007, 48th Leg., 1st Regular Sess. (Ariz. 2007). Representative John Kavanagh raised similar arguments. Id. Ultimately, the measure to set the burden of proof at “preponderance of the evidence” failed. Days later, discussing an amendment to lower the standard to “probable cause,” Representative Kavanagh explained his support for the latter:
I’m amazed that we provide bail to anybody who’s arrested for a crime that’s an illegal alien. I think anybody, regardless if it’s serious or a minor crime[,] should be denied bail.... We should deny bail to anybody here illegally who’s picked up. I therefore support this bill as a first step to what we should be really doing and that’s deporting anybody here illegally.
House Floor Meeting on S.B. 1265, June 13, 2007, 48th Leg., 1st Regular Sess. (Ariz.2007). The amendment lowering the standard of proof to “probable cause” passed.
While this is by no means an exhaustive survey of the evidence of punitive intent to be found in the record, the foregoing summary at least conveys the tenor of the legislative debates and ballot materials. The hostility directed toward undocumented immigrants based solely on their status could not be more obvious.
B
I acknowledge, of course, that there are references in the record to flight risk— indisputably, a legitimate objective of regulation, Salerno, 481 U.S. at 749, 107 S.Ct. 2095; Bell, 441 U.S. at 534, 99 S.Ct. 1861 — and more specifically, the unsupported premise that undocumented immigrants inherently pose a greater flight risk than other arrestees.[5] But there is noth *797 ing unusual about a “mixed” legislative record; legislators and voters often take positions for diverse reasons.
Indeed, the very concept of legislative intent can be “elusive,” Mendozau-Martinez, 372 U.S. at 168, 83 S.Ct. 554, and
[¡Judicial inquiries into [legislative] motives are at best a hazardous matter, and when that inquiry seeks to go behind objective manifestations it becomes a dubious affair indeed. Moreover, the presumption of constitutionality with which this enactment, like any other, comes to us forbids us lightly to choose that reading of the statute’s setting which will invalidate it over that which will save it.
Flemming, 363 U.S. at 617, 80 S.Ct. 1367. But recognizing the perils of second-guessing legislative intent does not relieve us of the responsibility to ascertain the law’s purpose, particularly here because, in my view, the overriding legislative intent is so apparent. See Salerno, 481 U.S. at 747, 107 S.Ct. 2095 (in evaluating restrictions on liberty, “we first look to legislative intent”).
That there are references to flight risk, as noted by the dissent, illustrates why the Supreme Court has prescribed a mutually-reinforcing, twin-pronged framework for analysis. See Bell, 441 U.S. at 539, 99 S.Ct. 1861. To the extent there is any doubt about the purpose of Proposition 100, the statements in the legislative record further support the conclusion, consistent with the majority’s analysis of its various provisions, that the law was intended as punishment.
This principle rings true at a general level — naturally, the law’s drafting and design sheds light on its purpose, and vice versa — but it also informs my analysis of the law’s specific provisions. For example, a number of Proposition 100’s excesses, including the evident ■ overbreadth of the critical term “serious felony offense,” were pointed out to the bill’s sponsors in Committee. As noted above, Senator Brother-ton drew attention to the specific examples of illegal downloading and alteration of a lottery ticket to emphasize the law’s excessive reach. See Senate Judiciary Committee Meeting on H.B. 2389 and H. C.R. 2028, Mar. 28, 2005, 47th Leg., 1st Regular Sess. (Ariz.2005). Yet, Proposition 100’s sponsors declined to narrow the definition of covered “serious felonies,” which renders “an exceedingly broad range of offenses” non-bondable. Maj. Op. at 784. Why Senator Brotherton’s concerns regarding Proposition 100’s excessiveness were brushed aside is plain from the record — because, as expressed by the bill’s supporters, “illegal aliens” “shouldn’t make bail for anything.” Senate Judiciary Committee Meeting on H.B. 2389 and H.C.R.2028, Mar. 28, 2005, 47th Leg., 1st Regular Sess. (Ariz.2005). The legislative debate over the standard of proof is also illustrative. Statements such as, “I’m amazed that we provide bail to anybody who’s arrested for a crime that’s an illegal alien,” House Floor Meeting on S.B. 1265, June 13, 2007, 48th Leg., 1st Regular Sess. (Ariz.2007), strongly suggest that the standard of proof was lowered in order to target undocumented immigrants as such, without respect to flight risk.
*798 I agree with the majority that we do not affirmatively require formal legislative findings or other evidence, yet may find the absence of such a record to be significant.[6] Maj. Op. at 784. I also readily acknowledge that there may be many cases where the mixed record renders legislative intent too elusive, or otherwise unknowable. This case, however, is not one of them. Intentionally meting out pretrial punishment for charged but unproven crimes, or the nonexistent crime of being “in this country illegally;”[7] is without question, a violation of due process principles. Mendozo-Martinez, 372 U.S. at 167, 83 S.Ct. 554; Bell, 441 U.S. at 539, 99 S.Ct. 1861.
Ill
“[I]t is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its powers, and its acts considered to be void,” Fletcher v. Peck, 6 Cranch 87, 128, 3 L.Ed. 162 (1810) (Marshall, C. J.), and I do not reach that conclusion lightly. However, the unequivocal expressions of penal intent in the record, viewed together with the excesses of the law’s various provisions, lead me to conclude that Proposition 100 is facially unconstitutional.

. According to Pearce, Proposition 100 was originally part of a package of legislation intended to "secure the borders.” The package also included: the Fair and Legal Employment Act, Ariz.Rev.Stat. § 23-212, which imposes penalties on employers for hiring undocumented immigrants; Proposition 102, Ariz. Const, art. II, § 35, a constitutional amendment to deny undocumented immigrants standing to recover in civil suits; Proposition 103, Ariz. Const, art. XXVIII, § 2, declaring English as the official language of Arizona; and Proposition 300, Ariz.Rev.Stat. §§ 15-191.01, 15-232, 15-1803, 15-1825, 46-801, 46-803, which prohibits undocumented aliens from receiving child care assistance, and those enrolled in public community colleges and universities from receiving the benefit of in-state tuition rates and financial aid, or participating in adult education classes.

. The record reflects that Proposition 100’s sponsors and supporters also presumed that undocumented immigrants are categorically more dangerous than other arrestees. In these proceedings, however, appellees have wisely abandoned this premise because it is completely unsubstantiated.

. The only specific case Thomas discussed was that of Oscar Garcia Martinez, who, according to Thomas, was released on bail, and deported by the federal government, rendering him unavailable to the state. Id. Sometime later Martinez apparently reentered, and was present at a confrontation that resulted in the shooting of a police officer by a third party. Id. However troubling Martinez’s case may be, it certainly does not demonstrate that undocumented immigrants pose a greater flight risk, given that it was the federal government that rendered Martinez absent.

. Thomas also claimed: "Other examples of illegal immigrants who made bail and avoided prosecution for serious crimes include accused child predators, armed robbers, drug dealers and other accused criminals.” Id. The only example Thomas provided, however, was the case of Oscar Martinez. See supra at note 3. And, as another legislator later correctly noted, "[tjhose individuals who are accused of committing heinous crimes [such as those cited by Proposition 100's supporters] are already denied bail under current state statutes....” House Floor Meeting on S.B. 1265, June 7, 2007, 48th Leg., 1st Regular Sess. (Ariz.2007) (statement of Rep. Krysten Sinema).

. For example, in one exchange, Representative Pearce asked: "[W]ouldn't you agree that somebody that's not in this country legally probably is a greater flight risk than some *797 body who is, who has roots here and is a citizen here?” House Floor Meeting on S.B. 1265, June 7, 2007, 48th Leg., 1st Regular Sess. (Ariz.2007). State Representative Pete Rios, who previously served as the first Latino president of Arizona’s State Senate, responded: "I know of some people in this country who don’t have proper documentation that probably have deeper roots in the state of Arizona than I do. They’ve been here for a couple of generations, they’ve got grandkids, so I mean that, in itself, I think does not determine whether or not one is a flight risk.” Id.

. Nobody disputes that there is no such evidence in the record. The dissent observes that undocumented immigrants reportedly commit a disproportionate share of felonies in Arizona. Tallman dissent at 801 (citing Arizona v. United States,-U.S.-, 132 S.Ct. 2492, 2500, 183 L.Ed.2d 351 (2012)). But even assuming that is true, it does not suggest undocumented immigrants overall are more likely to flee than other arrestees, nor does it shed light on the flight risk posed by any given individual defendant.

. The majority correctly points out that, "[a]s a general rule, it is not a crime for a removable alien to remain present in the United States.” Arizona, 132 S.Ct. at 2505.